[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION FOR TEMPORARY INJUNCTION
I
The present case concerns a dispute between the owner of 2 beauty salons and the manufacturer and distributors of certain hair care products over the right to use and sell those products. The plaintiff, Edward Silverstein[1] has, over the past five years, pursuant to certain salon contracts, purchased products manufactured by the defendant, Matrix Essentials, Inc. through Matrix distributors, the defendants, United Beauty Supply Corp. and Ace Beauty Supply, Inc., both of Monroe, Connecticut[2]. The contracts were signed by Mr. Silverstein and by representatives of United Beauty Supply Corp.
Each salon contract contains several clauses emphasizing the strict conditions for the sale of the Matrix products. The introductory paragraph states: CT Page 1232
 Matrix Essentials, Inc. ("Matrix") manufactures and sells a high quality line of hair care, skin care, cosmetic, lip and nail, and bath accessories which are designed and intended for sale only in professional salons that generate at least 50% of their gross revenues from providing professional services rather than from selling products. The undersigned distributor of Matrix products ("Distributor") is a distributor of Matrix products, and is contractually obligated to Matrix to sell its products only to professional salons for use in those salons or for resale to legitimate salon clients. The undersigned salon ("Salon") wishes to purchase Matrix products from Distributor, and Distributor is willing to sell Matrix products to Salon provided that Salon agrees to the terms and conditions set forth herein.
The contract further states, in relevant part:
 1. Salon warrants and represents that at least 50% of its gross revenues are from providing professional services rather than from selling products.
 2. All Matrix products purchased by Salon (a) will be used by Salon on its premises in connection with providing services to Salon clients, or (b) in the case of retail products designed for home maintenance use, will be sold only on the Salon's premises to legitimate Salon clients in such reasonable quantities as those clients may purchase for personal home maintenance use. Salon
will not resell Matrix products in bulk, nor resell Matrix products to any diverter or redistributor of products.
 5. Salon acknowledges that the diversion of Matrix products for non-salon locations seriously damages Matrix's reputation with consumers and the reputation of Matrix products, and may cause confusion as to Matrix's approval of the sale of its products through non-salon locations. Salon CT Page 1233 also acknowledges that diversion disrupts Matrix's business relations with legitimate salons and with Matrix's distributors, and costs Matrix hundreds of thousands of dollars every year to police and repurchase diverted products. Accordingly, Salon agrees that if it violates this contract, Matrix or Distributor shall be entitled to obtain an injunction in any court of competent jurisdiction against Salon prohibiting such violation, and that Salon will pay to Matrix or Distributor in damages a sum equal to the full retail price normally charged by Salon for any Matrix products sold to Salon that are resold by Salon in violation of this agreement, and that Salon will further pay as damages whatever costs are incurred by Matrix or Distributor to recover any such diverted product.
 6. Salon will take appropriate steps to ensure that all of its employees are made aware of this contract, and that they comply with it. (Emphasis in original.)
On or about March 1994, the plaintiff, in an apparent attempt to develop his product sales, placed an advertisement over the Prodigy Computer Network. He indicated that he would sell Matrix products along with other hair care products at a 15% discount. The plaintiff testified that he received 22 responses and two orders. One of the orders was from a Larry Davis of Burlington, Iowa in the sum of $223.52 for 30 bottles of shampoo and 6 bottles of conditioner. Matrix learned of the advertisement and orchestrated the Larry Davis sale. It then contacted both the plaintiff and the distributor, advising of the contract violation and its decision to terminate the contract. The plaintiff contacted Mr. Malin and then wrote to Matrix explaining the circumstances of the Prodigy advertisement. On May 5, 1994, Matrix again responded that the Prodigy sales violated the contract and warranted a termination of the contract.
Two days before his last correspondence, one of the distributor's salesmen signed a new contract with Mr. Silverstein. Matrix refused to sell products under the contract and the plaintiff filed this action seeking an CT Page 1234 order requiring Matrix to sell its products.
 II
A temporary injunction preserves the status quo until the rights of the parties can be determined after a full hearing. Jefferson Hospital v. Commission of Hospitals Health Care, 196 Conn. 451, 457 (1985). A trial court is required, however, to balance the equities, id., 460, which includes a determination of the likelihood that the appellant will ultimately prevail. Id., 456. Additionally, "[a] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." Walton v. New Hartford,223 Conn. 155, 165 (1992). This court does not believe that the plaintiff has met his burden. First, the salon contract can be terminated by either party "immediately upon notice." There is no requirement that notice be in writing or that there be a stated reason. Thus, as noted by the defendants,
 It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability. See 1 Restatement (Second), Contracts §§ 154, 159, and vol. 2 208 (1981); cf. Warner v. Pandolfo, 143 Conn. 728, 122 A.2d 738 (1956).
Holly Hill Holdings v. Lowman, 226 Conn. 748, 755-6
(1993). The plaintiff is not alleging mistake, fraud or unconscionability and there is no issue as to whether Matrix gave notice.
This court is also not convinced that this plaintiff is without an adequate remedy at law. This is, after all, CT Page 1235 a claim concerning a loss of revenue. In his testimony, Mr. Silverstein indicated that he is losing approximately $250.00 profit each week in Matrix products sales. He has a legal remedy.
There is, however, another reason to deny the requested relief. The contract specifies that the defendant's products are to be sold "in the Salon's premises to legitimate Salon clients in such reasonable quantities as those clients may purchase for personal home maintenance use. Salon will not resell Matrix products in bulk nor resell Matrix products to any diverter or redistributor of products." As evidenced by the testimony of Matrix official Patricia Urban, and the Matrix publications received in evidence, it is clear that Matrix seeks to have its products sold only at salons to salon customers in order to assure that the customers purchase the appropriate product. The products cannot be purchased at such places as supermarkets or chain stores. The Prodigy sale was clearly off the premises to a non salon client. Unless Mr. Davis has an extremely large family, his purchase suggests a resale purpose. It is clear that there was no professional consultation.
The plaintiff testified, however, that he did not know what a "legitimate salon client" was or what "in the premises" meant, that he had never read any of the monthly publications concerning diversion, had never received any specific warning about selling products through electronic mail or any information concerning how to determine whether someone was a diverter. While the terms are not defined in the contract, this court does not believe the contract is ambiguous. "The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." Zullo v. Smith,179 Conn. 596, 601 (1980). "In the Salon's premises" cannot, in any way, be construed to mean operating a mail order/computer order warehouse. "The contract is to be construed as a whole and all relevant provisions will be considered together." Lar-Rob-Bus Corporation v. Fairfield,170 Conn. 397, 407 (1976).
It is a basic maxim of equity that when a party seeks relief in equity he must come with clean hands,[3] seeCollens v. New Canaan Water Co., 155 Conn. 477, 492 (1967); CT Page 1236Boretz v. Segar, 124 Conn. 320, 323-4 (1938); that "his conduct must be fair, equitable and honest as to the particular controversy in issue". Collens v. New CanaanWater Co., supra. The evidence of the actions of the plaintiff in advertising over the computer network for off premises sales to non-clients and his corresponding testimony indicate a lack of fair conduct.
For these reasons, this temporary injunction is denied.
Berger, J.